**Signed and Filed: July 3, 2025**

_____
**DENNIS MONTALI
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case No. 22-30028 |
| E. LYNN SCHOENMANN, | ) Chapter 7 |
| Debtor. | ) |
| UNITED STATES OF AMERICA, | ) Adversary Proceeding<br>) No. 23-03043 |
| Plaintiff, | ) |
| v. | ) |
| E. LYNN SCHOENMANN, | ) |
| Defendant. | ) |

**MEMORANDUM DECISION AFTER TRIAL**

On June 9 and 10, 2025, the court conducted a trial to determine the dischargeability of debt owed by Debtor-Defendant E. Lynn Schoenmann ("Schoenmann") to Plaintiff United States Small Business Administration ("SBA"). At the conclusion of the trial, the court took the matter under submission. For the reasons set forth below, the court determines that the SBA has proven by a preponderance of the evidence that a prepetition

-1-

COVID-19 Economic Injury Disaster Loan ("EIDL") the SBA made to Schoenmann is nondischargeable under Section 523(a)(2)[1] and a separate penalty owed to the SBA due to Schoenmann's misuse of the EIDL is nondischargeable under Section 523(a)(7).

This Memorandum Decision After Trial constitutes the court's findings of fact and conclusions of law pursuant to Rule 7052.

I. **Background**

Schoenmann was admitted to the California state bar in 1981, after which she was periodically inactive until her resignation from the bar in 2014 to focus on her trustee practice. From 1997 to 2024, Schoenmann served as a chapter 7 panel trustee. She acted as a sole proprietor of her trustee practice, which encompassed other fiduciary roles at some points, such as state receiverships (Day 2 trial testimony of Schoenmann).

In her personal life, Schoenmann was married to Donn R. Schoenmann ("Donn") from 1993 until Donn's passing in 2018. At some point in May 2016, Schoenmann learned that Donn had, via counsel, modified his estate planning documents as well as certain grant deeds to marital properties. As a result of those modifications, a marital trust holding assets jointly with a right of survivorship, along with the rights of survivorship in

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Section 636(b)" refers to 15 U.S.C § 636, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

the grant deeds, were revoked. After learning of these modifications, Schoenmann initiated divorce proceedings.

In November 2016, Schoenmann and Donn signed a Post-Marital Agreement ("PMA") agreeing, among other things, that (1) their earnings and retirement account contributions would be treated as separate property (a deviation from California law which would deem earnings or retirement contributions by either spouse to be community property), with the lion's share held by Schoenmann; and (2) three of the four real properties would once again be held jointly with the right of survivorship. Schoenmann dismissed the divorce proceeding thereafter.

Upon Donn's passing in 2018, a probate for Donn was opened, and in 2019, litigation within the probate was initiated against Schoenmann by Donn's adult children and grandchild from Donn's first marriage, who are Schoenmann's stepchildren and step-grandchild, challenging the validity of the PMA ("probate litigation").

Around two years into the probate litigation, a bifurcated trial that spanned ten court days was conducted in November 2021. On December 27, 2021, the probate court entered a 26-page Tentative Decision. That Tentative Decision concluded that the PMA was a product of undue influence by Schoenmann against Donn, and that the PMA was invalid as a result.

While the probate litigation trudged on from 2019 through 2021, the COVID-19 pandemic overtook the country. In March 2020, in response to the global crisis, Congress passed the Coronavirus Preparedness and Response Supplemental

Appropriations Act, 2020,[2] which deemed COVID-19 to be a disaster covered by the EIDL program. Congress then enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),[3] which established the Paycheck Protection Program and expanded eligibility for the EIDL program, each loan programs that made long-term, low-interest loans to businesses and non-profits that had suffered economic injury due to COVID-19.

After having received two loans under the Paycheck Protection Program, Schoenmann received an email notice from the SBA on October 4, 2021, notifying her that she may be eligible to receive an EIDL for her business. On October 8, 2021, Schoenmann submitted an EIDL application ("Application") (SBA Exs. 5, 22). The Application contained a specific section for Schoenmann and other applicants to list "Contingent Liabilities" that included "Legal Claims & Judgments," as well as a separate section for applicants to list "Other Liabilities (describe in detail)." Schoenmann did not mention the probate litigation in those sections or anywhere else in her Application (SBA Ex. 5). Upon approval of her Application, Schoenmann signed a Loan Agreement promising that she would only use the EIDL proceeds "solely as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020 and continuing thereafter." (SBA Ex. 6).

Schoenmann signed the Loan Agreement on October 29, 2021. On December 13, 2021, she received loan proceeds in the amount

---

[2] Pub. L. No. 116-123, 134 Stat. 146 (Mar. 6, 2020).

[3] Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020).

of $924,700 (minus a small fee). Almost immediately after receiving the proceeds, Schoenmann spent nearly one third of them on probate litigation expenses including attorney fees and fees for expert witnesses. She then spent another $155,000 on retainers for bankruptcy professionals. A small amount (around $55,000) was spent on Schoenmann's trustee business. The remaining approximately $450,000 was then placed in a brokerage account to, in Schoenmann's own words, earn income for her until she had to pay back the EIDL over 30 years at a generously low $3.75 interest rate.

On January 14, 2022, just over two weeks after the Tentative Decision was issued and just one month after she received the EIDL proceeds, Schoenmann filed bankruptcy. The SBA timely filed this adversary proceeding. After granting, then reconsidering Schoenmann's motion for partial summary judgment, the court determined that the main factual issues for it to decide at trial were the SBA's reliance on Schoenmann's Application and Loan Agreement (Dkt. 65) and the amount of its damages.

**II. The EIDL is Nondischargeable Pursuant to Sections 523(a)(2)(A) and alternatively, (a)(2)(B).**

Section 523(a)(2) "excepts from discharge debts arising from various forms of fraud." *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 715, (2018). Subpart (A) concerns "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . .financial condition" while subpart (B) focuses on "statement[s] in writing . . .that

-5-

[are] materially false. . .respecting the debtor's or an insider's financial condition." Section 523(a)(2).

The SBA seeks a ruling that the EIDL is excepted from discharge pursuant to both subparts of Section 523(a)(2).

A creditor must prove the following elements by a preponderance of the evidence to establish the nondischargeability of a debt under Section 523(a)(2)(A):

> "(1) misrepresentation, fraudulent omission, or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of [the debtor's] statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by his reliance on the debtor's statement or conduct."

*Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000) (citations omitted).

A creditor must prove nearly those same elements to establish the nondischargeability of a debt under Section 523(a)(2)(B), except that the misrepresentation must be a statement in writing respecting the debtor's financial condition, that the statement must be material, and the creditor reasonably relied on the statement. *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992).

The SBA has proven all the above elements respecting both supbarts (A) and (B).

-6-

Case: 23-03043   Doc# 86   Filed: 07/03/25   Entered: 07/03/25 14:16:13   Page 6 of 17

**A.   Fraudulent Misrepresentation as to Use of the Loan in the Loan Agreement Certification**

The court is satisfied that Schoenmann knowingly and falsely swore, by signing the Loan Agreement, solely to use the EIDL for working capital for her trustee business to alleviate economic injury caused by COVID-19, which renders the EIDL nondischargeable pursuant to 523(A)(2)(A).  Not once, in Schoenmann's trial brief, her trial testimony, or in any filing in this adversary proceeding or in her bankruptcy, has Schoenmann claimed her trustee practice suffered at all due to the pandemic.  At trial and in her briefs, she only states that she sought the EIDL because she could, because she received an email from the SBA letting her know she may be eligible to seek EIDL funds.  Schoenmann knew that she would not be using the EIDL to alleviate economic injury caused by the pandemic because she had not suffered any.

In her defense, Schoenmann first blames the SBA for failing to provide a definition of "working capital."  Without a definition, Schoenmann argues, she could not possibly know what the EIDL could or could not be spent on, and thus could not have made any false representation as to how she would use the EIDL.

While the SBA did not define the term "working capital" in the EIDL Application or in the Loan Agreement, Schoenmann could have asked for clarification of the term at any point in the application process.  The record shows that Schoenmann reached out to the SBA directly regarding her Application and pending loan disbursement at least twice. (SBA Exs. 14, 24).  Schoenmann could have clarified how loan proceeds were to be used, in

-7-

Case: 23-03043    Doc# 86    Filed: 07/03/25    Entered: 07/03/25 14:16:13    Page 7 of 17

addition to her main questions of when she would receive the proceeds, had she so chosen. Schoenmann herself also references the SBA's own online information webpage regarding uses of proceeds: "Working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt incurred at any time (past, present, or future)." (Schoenmann Trial Brief, Dkt. 75 p. 13).

Schoenmann next argues that her defense of the probate litigation was inherently a defense of her trustee practice and was thus an appropriate expenditure of the EIDL as working capital. In her view, because the probate litigants sought to ensure Donn's estate received its fair share of marital assets under California law, and because those marital assets would include her income from her trustee practice (as well as her rental properties and retirement account, which she claimed for the first time at trial she considered to be part of her business), the probate litigation was a direct threat to her business and any money paid toward defending the probate litigation was an expenditure of working capital. This argument is not credible and appears to purposefully elide the point of the EIDL entirely. No borrower was entitled to use EIDL proceeds to fund a defense of unrelated pre-COVID litigation, even if the outcome of that litigation could conceivably jeopardize the borrower's business. The COVID-era EIDL program was meant to utilize taxpayer funds to prop up small businesses

-8-

Case: 23-03043    Doc# 86    Filed: 07/03/25    Entered: 07/03/25 14:16:13    Page 8 of 17

and nonprofits directly affected by the pandemic.[4]  "Any professional should understand the difference between business expenses, also characterized as working capital, and expenses incurred during personal litigation between family members, however characterized." (Order Granting Motion to Remove E. Lynn Schoenmann as Chapter 7 Trustee, *In re Li's Capital LLC*, Case No. 23-3043, Dkt. 144, p.10, *aff'd by Schoenmann v. United States Tr. (In re Li's Cap. LLC)*, 2025 Bankr. LEXIS 902 (9th Cir. BAP 2025)).[5]

For the first time at trial, Schoenmann presented as a last minute and unlabeled exhibit a portion of the CARES Act that clarifies that for the purpose of making loans, any EIDL applicant is presumed to have been economically injured by the COVID-19 pandemic.  This does not help.  Whatever presumptions were mandated by the CARES Act, all EIDL applicants, including Schoenmann, were required to affirm that the EIDL would solely be used for that presumed economic injury caused by COVID-19.

---

[4] Division A, Title I of the CARES Act, which expands EIDL eligibility, is titled "KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION; KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT." Section 7(b) of the Small Business Act, which enables the EIDL program, states that "[i]t is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to ensure free competitive enterprise . . ."

[5] The court does not apply any principles of estoppel by quoting its Order Granting Motion to Remove E. Lynn Schoenmann as Chapter 7 Trustee, entered in the *Li's Capital* matter.  The court's position that working capital does not include capital spent on personal litigation, even if that litigation may indirectly affect a litigant's business, remains unchanged.

-9-

The presumption did not eliminate Schoenmann's duty to be truthful in the Loan Agreement or to use the funds in the manner prescribed by the Loan Agreement.

The SBA has shown justifiable reliance on Schoenmann's representation that she would use the funds solely as working capital for her injured business. As Schoenmann herself noted, by law, the SBA had to presume economic injury when making EIDL funding decisions. The SBA's witnesses testified that had Schoenmann clarified her true plans for the EIDL, or if she had failed to sign the Loan Agreement or somehow altered it to remove that promise regarding spending of the EIDL, the SBA would have refused to fund the loan even after approval of the Application.[6]

Finally, the court is satisfied that the making of the loan under these false pretenses caused injury to the SBA and finds the SBA established the amount of those damages (principal of $924,700, plus pre-petition interest of $3,040.11).

**B.    Failure to List Contingent Liabilities or Legal Claims in the Application**

The court is satisfied and finds that Schoenmann's Application is a materially false written financial statement which renders the EIDL nondischargeable under Section 523(a)(2)(B).

---

[6] The record reflects that Schoenmann initially attempted to alter a different part of the Loan Agreement, and was contacted by the SBA to inform her that alterations were not acceptable (SBA Exs. 24, 25).

-10-

The Application is a document for the SBA to evaluate an applicant's ability to pay back a loan, considering income, assets (both personal and real property) and liabilities of all types. The Application as a whole is a written financial statement respecting the Debtor's financial condition. *See In re Tallant*, 218 B.R. 58, 70 (BAP 9th Cir. 1998) (noting the Ninth Circuit has adopted neither a broad nor expansive view as to what constitutes a statement respecting financial condition and finding a profit and loss statement was a statement regarding financial condition). A written financial statement that contains material omissions may still be nondischargeable under Section 523(a)(2)(B). *In re Gertsch*, 237 B.R. 160, 168 (9th Cir. BAP 1999) (debt nondischargeable where debtor omitted significant liabilities from personal financial statement).

The Application specifically directed prospective borrowers to list any "Contingent Liabilities" including contingent liabilities arising from "Legal Claims and Judgments." The testimony of the SBA's employees at trial made clear that liabilities listed in any EIDL application would trigger further scrutiny, and potentially denial of the loan. The SBA's internal Rapid Finance notes show notations to and from multiple loan officers with requests for information and clarification both before and after approval of the Application and prior to funding the EIDL. (SBA Ex. 14). The SBA reviewed and relied on the information Schoenmann provided in the Application, and that reliance was reasonable. As previously noted, a lender may demonstrate reasonable reliance "by showing that it followed normal business practices." *In re Gertsch*, 237 B.R. at 170.

-11-

"Lenders do not have to hire detectives before relying on borrowers' financial statements.... Although a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification." *Id.* (internal quotations omitted). The SBA has shown that it followed its normal practices in reviewing Schoenmann's Application, and Schoenmann's withholding of such significant information from her written statement was material to SBA's reasonable reliance.

Schoenmann chose not to disclose the probate litigation, because, she says, she did not believe she could lose, and therefore did not believe it was truly a contingent liability. Whether Schoenmann thought the probate litigation had any merit does not negate the fact that the litigation did indeed exist as a substantial legal claim and contingent liability of hers. It is beyond credulity that any professional, let alone one with Schoenmann's extensive background, could believe that litigation with such dire potential financial consequences was somehow not a contingent liability.

A final legal argument Schoenmann makes in her trial brief is her omissions in her Application cannot be considered written statements respecting financial condition (as they are unwritten) and thus fall out of the purview of Section 523(a)(2)(B), and since the omissions concern her financial condition, they fall out of the purview of 523(a)(2)(A) as well.

While there have been recent developments regarding fraudulent omissions in the Ninth Circuit, those developments do

not remove Schoenmann's actions from the reach of Section 523(a)(2). In *Oregon v. Mcharo (In re Mcharo)*, 611 B.R. 657 (9th Cir. BAP 2020), a debtor's failure to report a change in income was considered a fraudulent omission for the purposes of Section 523(a)(2)(A). More recently, in *Manion v. Strategic Funding Source, Inc., d/b/a/ Kapitus Inc. (In re Manion)*, 667 B.R. 473 (9th Cir. BAP 2025), a debtor who signed an agreement stating his financial circumstances had not changed significantly when in fact they had, was found to have made a fraudulent omission under Section 523(a)(2)(A). In short, because an "omission" is definitionally not a "statement," then it cannot be a statement regarding financial condition and is still actionable under Section 523(a)(2)(A). *Id.* at 480-81.

    The facts of this case are distinguishable from *Mcharo* and *Manion,* both of which involve debtors failing to report changes to their finances while under an obligation to do so. This case is more closely aligned with the facts of *Gertsch,* in which a debtor submitted a financial statement that contained fraudulent omissions to create an overall skewed picture of that debtor's financial state and was analyzed under 523(a)(2)(B). Here, as in *Gertsch*, the entirety of the Application is a financial statement, and the omissions within that financial statement mean that the Application as a whole is a false representation of Schoenmann's financial condition.

    However, the *Manion* court recognized that the analysis between Section 523(a)(2)(A) and (B) can become "murky". *In re Manion*, 667 B.R. at 480. To the extent the omissions should be taken out of the context of the overall financial statement,

-13-

those omissions would also be nondischargeable under Section 523(a)(2)(A), and with a far lower threshold of proof than that of Section 523(a)(2)(B). For fraudulent omissions, a court need only find that the omitted information was material, and that the debtor had a duty to disclose the information. *Apte v. Romesh Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1323 (9th Cir. 1996) ("The nondisclosure of a material fact in the face of a duty to disclose has been held to establish the requisite reliance and causation for actual fraud under the Bankruptcy Code.").

The SBA was proximately harmed in making the loan to a debtor in the face of limited Congressionally appropriated funds that could and should have gone to other borrowers.

The EIDL is nondischargeable under Section 523(a)(2)(B).

### III. **The Penalty Owed to the Small Business Administration under 15 U.S.C. § 636(b) is Nondischargeable Pursuant to 11 U.S.C. § 523(a)(7)**

Section 523(a)(7) exempts from discharge any debt "for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for pecuniary loss[.]"

Section 636(b) states that "Whoever wrongfully misapplies the proceeds of a loan obtained under this subsection[7] shall be civilly liable to the [SBA] Administrator in an amount equal to one-and-one half times the original principal of the loan." This liability applies to anyone who wrongfully misapplies the

---

[7] Section 636 enables the EIDL program.

-14-

EIDL proceeds, no matter how the EIDL was obtained. In other words, even if Schoenmann had the best of intentions when applying for the EIDL, her wrongful misuse of the EIDL would subject her to the penalty of Section 636(b) and nondischargeability of that penalty under Section 523(a)(7).

While Schoenmann argues that a civil liability is somehow not a synonym for "fine" or "penalty," the court concludes that in the context of the surrounding language of Section 636(b), the civil liability described by the statute is indeed a penalty, nondischargeable in her bankruptcy.

### A. Section 636(b) is a Penalty Payable to a Government Unit

Section 636(b) does not define "civilly liable", and the Code does not define "penalty." "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. U.S.*, 444 U.S. 37, 42 (1979) (citations omitted). "When determining the plain meaning of language, we may consult dictionary definitions." *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007). Webster's Dictionary lists a few applicable definitions, including: "the suffering or sum to be forfeited to which a person agrees to be subjected in the case of nonfulfillment of stipulations" and a "disadvantage, loss, or hardship due to some action."[8] The civil liability described by Section 636(b) for wrongful misapplication of EIDL proceeds is, indeed, the

---

[8] www.merriam-webster.com/dictionary/penalty.

-15-

dictionary definition of a penalty. It is not compensation for a pecuniary loss and is an additional amount owed for wrongful conduct.

The court's analysis may stop at a plain reading of the statute. However, looking to the legislative history of Section 636(b) shows that Congress explicitly intended the "civil liability" in the statute to be a penalty. In a 1972 statement to Congress in support of the language of Section 636(b) at issue in this case, then Small Business Administrator Thomas S. Kleppe stated the following:

> "Further, we support the concept of a civil
> penalty for any borrower who wrongfully
> misapplies the proceeds of his loan.
> Enactment of such a penalty provision should
> enhance the ability of this Agency to
> prosecute successfully those cases of
> willful or wrongful use of loan proceeds
> which come to our attention."

Small Business Disaster Loans: Hearings on S. 1649, S.3337, S.3446, S. 3725, S.3795, S.3797, S.3801, and H.R. 15692 Before the Subcomm. on Small Business of the S. Comm. On Banking, Housing, and Urban Affairs, 92nd Cong. 341 (1972) at 44.

The court is satisfied that the 150% penalty established under Section 636(b) is nondischargeable pursuant to Section 523(a)(7). Schoenmann's misuse of those proceeds to pay her probate litigation counsel, her bankruptcy counsel and save the rest in a brokerage account results in her additional statutory liability.

-16-

Schoenmann is liable for a penalty of one-and-one half times the principal amount of the EIDL pursuant to Section 636(b), and that penalty is nondischargeable under Section 527(a).

## IV. Conclusion

For the reasons set forth above, the outstanding EIDL proceeds owed by Schoenmann to the SBA are nondischargeable under Section 523(a)(2) and a separate penalty owed to the SBA due to Schoenmann's misuse of the EIDL is nondischargeable under Section 523(a)(7).

A Judgment After Trial against Schoenmann in the amount of $2,314,790.11 (EIDL principal of $924,700.00; pre-petition interest of $3,040.11; $1,387,050.00) is being entered concurrently with this Memorandum Decision.

**END OF MEMORANDUM DECISION**